

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

JUN 2 2008

CLERK, U.S. DISTRICT COURT

By _____
Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| PATRICIA E. MORGAN, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:07-CV-546-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

A.     STATEMENT OF THE CASE

Plaintiff Patricia E. Morgan brings this action pursuant to Section 405(g) of the Social

Security Act, Title 42 of the United States Code, for judicial review of a final decision of the

Commissioner of Social Security denying her claim for disability insurance benefits under Title II

of the Social Security Act. She applied for disability insurance benefits on July 15, 2004, alleging

disability commencing May 19, 2004. (Tr. 64, 147). Morgan met the insured status requirements

at all times relevant to the administrative decision. (Tr. 52).

The Social Security Administration denied her application for benefits both initially and on

reconsideration, and Morgan requested a hearing before an administrative law judge (the "ALJ"). ALJ William H. Helsper held a hearing on July 19, 2006, in Fort Worth, Texas. Morgan was represented by counsel during the proceedings. On August 21, 2006, the ALJ issued a decision that Morgan was not disabled because she had the residual functional capacity (RFC) to perform a modified range of light work, including her previous work as an office clerk. (Tr. 15-20). The Appeals Council denied Morgan's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4).

B. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of a listing alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual

functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley,* 197 F.3d at 198. A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve. *Masterson,* 309 F.3d at 272. The court will not re-weigh the evidence, try the questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir.2000); *Hollis,* 837 F.2d at 1383.

C.    ISSUES

1.    Whether the ALJ's decision at Step 3 of the sequential evaluation process was proper;

2.    Whether the residual functional capacity assessment is supported by substantial evidence;

3.    Whether the decision is supported by the vocational evidence; and

4.    Whether the ALJ properly assessed Morgan's credibility.

D.    ADMINISTRATIVE RECORD

1.    Medical History

Morgan was born June 18, 1953, and completed high school. She was previously employed as an office clerk, but alleges that she has been disabled since May 19, 2004, due to neck pain, right arm and hand impairments, and mental health impairments.

Morgan's medical history includes a cervical fusion in 1996. (Tr. 150, 177). In 2002, neurosurgeon Lee Kesterson, M.D., examined Morgan to assess her complaints of cervical discomfort and decreased range of motion, with pain radiating to her shoulder. Kesterson recommended a cervical diskectomy[1] and fusion at C6-C7, which was performed February 21, 2002. (Tr. 262). Morgan's symptoms initially resolved, (Tr. 165), but in September 2002, Morgan reported cervical and left arm pain that was worse than before surgery and was especially problematic when she was working. Kesterson thought that Morgan's symptoms were related to her cervical condition and recommended a nerve root block. (Tr. 163-64). At a follow-up visit on November 15, 2002,

---

[1] A diskectomy refers to surgical excision of an intervertebral disc. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 553 (31st ed. 2007).

Morgan reported 100% improvement in her cervical-related symptoms. (Tr. 162). She reported a decrease in her arm problems as well because she was not working, having been laid off for excessive absenteeism. On examination, she had good upper extremity strength and good cervical range of motion. (Tr. 162).

Morgan saw orthopedic surgeon James Box, M.D., in November 2003, upon referral from the Texas Rehabilitation Commission. (Tr. 207-210). She reported a history of two cervical fusions, with residual neck pain, spasms, and numbness in her left hand and arm, as well as previous surgeries for bilateral carpal tunnel syndrome and bilateral ulnar neuropathy.[2] (Tr. 194, 207). She also complained of stiffness and spasms in her lower back with related left leg pain. (Tr. 207).

On examination, Box noted that Morgan's cervical flexion and extension was limited by about 50%, with rotation restricted to 45 degrees bilaterally. Deep tendon reflexes were reduced in the biceps and triceps, but sensation was grossly intact. (Tr. 208). Examination of the lumbar spine found essentially negative straight leg raising in a seated position, and questionably positive straight leg raising at 70 degrees on the left in the supine position, but negative on the right. Range of motion was normal, but her reflexes were diminished. (Tr. 208).

Box diagnosed herniated nucleous pulposus of the cervical spine, status post two surgeries; herniated nucleous pulposus of the lumbar spine by history; and bilateral carpal tunnel syndrome or bilateral ulnar neuropathy. He completed a residual functional capacity assessment in which he

---

[2] Carpal tunnel syndrome is a complex of symptoms resulting from compression of the median nerve in the carpal tunnel, with pain and burning or a tingling sensation in the fingers and hand, sometimes extending to the elbow. DORLAND'S at 1850. Neuropathy refers to a functional disturbance or pathological change in the peripheral nervous system. *Id.* at 1287.

found Morgan could stand for two to four hours, walk for two to four hours, and sit for two to four hours in an eight-hour workday. (Tr. 209). She was capable of lifting up to 10 pounds frequently and up to 20 pounds occasionally. Box opined that Morgan was unable to perform "fine work" or high speed assembly, nor could she work in cold, damp and wet environments, or at heights. (Tr. 210).

Morgan consulted Thomas C. Binzer, M.D., on April 28, 2004, for her complaints of pain in her neck, right shoulder, and right elbow. (Tr. 213). Magnetic resonance imaging (an MRI) of the shoulder revealed a partial rotator cuff tear with shoulder impingement and bursitis. Morgan exhibited limited range of motion in her shoulder, with painful rotation. X-rays of her cervical spine suggested a cervical nonunion. (Tr. 213). Binzer ordered a computed tomography (CT) scan, which showed a failed cervical fusion and spurring near the fusion site. (Tr. 211,212). Binzer diagnosed cervical radicular syndrome with a failed fusion and cervical radiculopathy.[3] (Tr. 211). Morgan was referred to David Findlay, M.D., for a pain management assessment.

Findlay evaluated Morgan on June 17, 2004. (Tr. 335-339). Morgan reported radicular pain triggered by neck extension. She rated her current pain level as a 7 on a scale of 10 (with 10 reflecting extreme pain), but stated that the pain reaches level 10 on her worst days. Aggravating factors included activity, hand movement and neck rotation. She also complained of arm weakness and intermittent numbness and tingling in her arm. (Tr. 335). Morgan reported sleep disturbance, headaches, fatigue, weight change, loss of appetite, night sweats, pallor, stiffness, neck pain, numbness, depression and moodiness. (Tr. 337).

---

[3]    Radiculopathy is disease of the nerve roots. *Id.* at 1595.

Examination showed Morgan to be in moderate discomfort. Her cervical spine was tender to palpation with a restricted range of motion. (Tr. 337-338). Neck rotation was limited with referred pain in her right arm. Her gait and range of motion in her lumbar spine were normal, and a straight leg raising test was negative. Sensation was diminished in Morgan's right upper extremity. (Tr. 338). Findlay assessed cervical radiculopathy, secondary myofascial pain syndrome, and cervical facet syndrome. (Tr. 338). Recommended treatment included medication, physical therapy, stimulation treatment, and possible surgical intervention. (Tr. 339). Findlay administered a cervical medial branch nerve block on July 9, 2004, (Tr. 333), and a lumbosacral medial nerve branch block on August 11, 2004, with good results. (Tr. 327).

Morgan returned to Binzer's office on August 25, 2004, with complaints of continued neck pain. On physical examination, Morgan exhibited positive straight leg raising, impingement signs[4] in the right shoulder, and a partial rotator cuff tear. Binzer diagnosed cervical radicular syndrome, cervical radiculopathy, partial rotator cuff tear, and lumbar radicular syndrome. (Tr. 211).

During a follow-up visit with Findlay on May 2, 2005, Morgan complained of back pain radiating into her right leg. (Tr. 315). She exhibited a stiff and antalgic gait, and had Heberden nodes[5] on her fingers. Range of motion in her cervical spine was severely limited in all directions, and range of motion in her lumbar spine was restricted secondary to pain. (Tr. 317-18). Straight

---

[4] Impingement syndrome refers to progressive pathologic changes resulting from mechanical impingement against the rotator cuff. *Id.* at 1859.

[5] Heberden nodes are nodules produced by calcific spurs in the cartilage associated with osteoarthritis. *Id.* at 1299.

leg raising was negative, with normal range of motion in her upper extremities and left leg, but palpable sacroiliac tenderness in her right leg. Motor examination resulted in findings of normal tone, bulk and strength. (Tr. 318). Sensation was normal, and deep tendon reflexes were 2+ and symmetric. (Tr. 318). Morgan exhibited appropriate judgment and good insight, with intact recent and remote memory; however, her mood was depressed and her affect was blunted. Steroid injections for symptomatic relief were given on May 4, 2005. (Tr. 312-313).

When Morgan was reexamined on June 3, 2005, the findings were essentially unchanged. Morgan reported recent improvement in that she was able to do household chores and gardening, and was sleeping better, but she still rated her average pain as a 9 on a scale of 10. (Tr. 305). She complained of falling all the time and was wearing a cast on her right foot due to fractures of her fourth and fifth toes. At a follow-up visit on July 13, 2005, Morgan rated her average pain as a level 9 on a scale of 0 to 10. She reported experiencing a 35% improvement in her condition since she started treatment at the pain clinic. Morgan said she was frustrated and was sleeping a total of three or four hours per night. (Tr. 293).

Morgan was evaluated by neurologist Shirley A. Molenich, M.D., on June 15, 2005, for her complaints of headaches, syncope, and falling. (Tr. 290-292). She described occasional tingling in her face and severe pain from one side of the head to the other. (Tr. 290). Morgan also reported problems with confusion, including occasions when she would be driving and not know where she was. (Tr. 291). On examination, Molenich noted a little asymmetry in Morgan's right upper extremity not being quite as strong as the left. Deep tendon reflexes were asymmetric, and Morgan

had better sensation on the left than the right. (Tr. 291). Morgan had fairly symmetrical strength in her lower extremities, although deep tendon reflexes were diminished. Molenich noted no remarkable problems with Morgan's gait. Molenich made arrangements for additional testing, but subsequently withdrew from treating Morgan because of communication issues with Morgan's other physicians. (Tr. 286-89, 292).

Morgan was evaluated by neurologist Roger Blair on June 23, 2005, for episodes of falling that occurred once or twice a month. (Tr. 280-284). Morgan reported that these episodes usually occurred when she stood after sitting for awhile. Morgan further complained of headaches, difficulty walking, back pain, neck pain, stiffness, urinary infections, urinary urgency, fatigue, significant weight gain, shortness of breath, and abdominal pain. (Tr. 281-282).

On examination, Morgan was noted to be 5 feet, 3 inches tall and moderately obese at 202.5 pounds. (Tr. 282). A physical and mental examination was relatively unremarkable. Her gait was regular, and she was able to walk on her heels and toes and tandem walk. Motor strength was normal and sensation was intact; however, her reflexes were diminished. An electroencephalogram (EEG) was normal in both the awake and drowsy tracing. Blair's impressions included syncope, possible seizure disorder (which Blair considered unlikely), chronic back pain, exogenous obesity, generalized deconditioning, chronic depression, and urinary incontinence. (Tr. 283).

The medical records also contain information about Morgan's reported mental impairments. She underwent a neuropsychological evaluation in October 2003, performed by Edward G. Bleker, Ph.D. (Tr. 195-206). Her presenting problems including a hearing impairment, high blood pressure,

neck and back impairment, memory difficulties, depression and anxiety. (Tr. 195). She was neat and clean in appearance, with no indication of hallucinations, delusions, or problems with thoughts or affect. Morgan was cooperative and friendly, with goal-directed and logical thinking. (Tr. 196).

On examination, Morgan was oriented and scored in the lower average range with respect to her surroundings and common events, names, dates and places of prominent individuals or occurrences. (Tr. 196). She also scored in the lower average range on sequencing activities, which had implications for job training and placement in situations with multi-tasking requirements. She had mild expressive difficulties that were attributed to her hearing impairment. Morgan was able to manage fine and gross motor movements effectively, and her processing speed was within the average range. (Tr. 197-98). Her full-scale IQ score was 91. Bleker found that Morgan had an average to high-average working memory, but variation in her scores suggested inconsistent abilities. (Tr. 199). Her ability to learn and remember new material was average, and on achievement testing, she scored at a high school level in reading and arithmetic and an eight-grade level for spelling skills.

A behavioral assessment found that Morgan felt persecuted, humiliated and disparaged by others. She demonstrated avoidance of autonomous behaviors, and she was noncompetitive, behaved submissively, and depreciated her personal self-worth. (Tr. 202). Bleker diagnosed dysthymia; generalized anxiety disorder; mathematics and written expression disorders; and dependent, avoidant personality traits. He assigned a current Global Assessment of Functioning (GAF) score of 60.[6] (Tr.

---

[6] A GAF score is a standard measurement of overall psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994)(DSM-IV). *See Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001). A GAF score of 51 to 60 reflects moderate symptoms or moderate impairment in functioning. DSM-IV at 34.

203).

A vocational evaluation was performed by Sally Mickel, M.S., on June 29 and 30, and July 1, 2004, at the request of the Department of Assistive and Rehabilitative Services. (Tr. 123-132). A Career Ability Placement Survey to evaluate Morgan's relative strengths and weaknesses reflected that her interests, aptitudes and values corresponded best with occupations in Skilled Science, Outdoors, and Skilled Technology. (Tr. 124). Her academic scores placed her at a tenth-grade reading level, a seventh grade arithmetic level, and a fifth grade level for language skills. On testing, she met and exceeded worker-qualification profiles in the areas of coordinating and scheduling, record verification and proofing, record preparation and maintenance, and routing and distributing. (Tr. 125). On testing designed to provide a reliable estimate of a person's general learning abilities, Morgan scored at the 6th percentile, which was well below average. (Tr. 127).

Mickel noted that Morgan had been punctual and exhibited concentration and persistence with the tasks at hand. She also responded well to supervision and demonstrated an adequate frustration tolerance. (Tr. 128). Morgan did have difficulty completing a job application, and her resume and cover letter reflected poor use of grammar. (Tr. 128). Mickel opined that Morgan could perform her previous sedentary and light work if accommodated with an ergonomic keyboard, headset, and a possibly varied work schedule. (Tr. 128). Her transferable skills included filing, telephone appointments and scheduling, basic date entry, and use of fax and copier machines. (Tr. 130). Mickel noted that Morgan wore hearing aids in both ears, although she had lost one and broken the other, and she had difficulty understanding conversational speech without her hearing

aids. (Tr. 129). Mickel suspected that Morgan had a language learning disability, and Morgan said that she felt isolated in the workplace because of her hearing loss and lack of socialization skills. (Tr. 130). Mickel noted that severe chronic pain can affect concentration and job performance. (Tr. 129). In addition, Morgan appeared severely stressed and anxious, which Mickel opined could exacerbate her pain. (Tr. 132). Mickel recommended basic work-related refresher courses and opined that Morgan might have significant problems learning new tasks. (Tr. 131).

Jyoti Patel, M.D. performed a psychiatric evaluation of Morgan in October 2004 as part of the disability application process. (Tr. 223-225). Morgan reported crying spells, moodiness, increased irritability, and agitation. She no longer cared about her appearance and her husband had to remind her to bathe. Morgan complained of feelings of worthlessness, poor self-esteem, and low self-confidence. She preferred to isolate herself from others and had made suicidal gestures, although she stated that her preference would be to just run away. (Tr. 223). Morgan complained that she slept poorly and awakened frequently at night because of bad dreams. She complained of low energy and had gained a significant amount of weight. She complained of impaired memory, concentration and attention, and sometimes lost her train of thought while speaking. (Tr. 223).

Morgan said that she was raised in a supportive family, but she was molested by a neighbor when she was eight years old and had flashbacks of the assault. Morgan's affect was depressed, sad, anxious, tearful, and distressed due to pain and discomfort. Her thought processes were logical, clear, and goal-directed, but her thought content was worried, pessimistic, helpless, sad, guilty and tearful. (Tr. 224). Morgan remembered her social security number, significant birth dates, and three

of the four most recent Presidents, but was able to recall only one of four objects after five minutes. Morgan was unable to count backwards from 20 to 0, subtract serial 7s from 100, perform simple calculations, or spell the word "world" backwards, but was able to repeat five digits forward and backwards. Morgan reported that she kept up with current events by reading the newspaper and watching television, and exhibited a well developed capacity for abstract thought. She exhibited insight into her condition and good judgment. (Tr. 224).

Morgan reported that she was able to manage all activities of daily living, but needed help with her housework. She cooked twice a week, shopped for groceries, used a riding lawn mower to mow her yard, and bathed every other day. (Tr. 225). Morgan indicated that she was unable to complete tasks in a timely and appropriately manner for sustained periods because she has low energy and needs frequent breaks. Her concentration, persistence and pace were assessed as slowed. Patel diagnosed major depression secondary to chronic pain syndrome and post-traumatic stress disorder, and assessed a GAF score of 40-50.[7] He assigned a guarded prognosis. (Tr. 225).

The state agency medical consultants found Morgan capable of performing the requirements of light work with limited overhead reaching. (Tr. 214-21). They also found that Morgan had affective and anxiety-related disorders that caused mild restriction in her daily activities, mild restriction in social functioning, and moderate limitation in maintaining concentration, persistence, or pace. (Tr. 226, 229, 231, 236).

---

[7] A GAF score of 41-50 reflects serious symptoms or any serious impairment in social, occupational or school functioning. DSM-IV at 34. A score of 31-40 reflects some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.*

The state agency consultants completed a mental residual functional capacity assessment found Morgan to be moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. She was considered markedly limited in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. The state agency medical consultants concluded that Morgan was able to understand, remember, and carry-out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; accept instructions and respond appropriately to changes in routine work setting. (Tr. 242-44).

On November 10, 2005, Morgan was taken to the emergency room after she attempted to jump out of a moving car the day before and reported continuing suicidal thoughts, anxiety, depression, difficulty sleeping, anger, and hostility. (Tr. 377-86). The diagnoses was major depression. (Tr. 386).

2.      Administrative Hearing

Morgan testified that she was fifty-three years old and had most recently worked in a clerical position at a doctor's office. (Tr. 426-27). She testified that she spent most of the day watching

television or sleeping. (Tr. 427, 432). She occasionally prepared meals, but her husband did the grocery shopping. (Tr. 427-28). Morgan testified that her neck pain radiates into her shoulders, arms and fingers, and she had been told that she had a failed fusion in her neck. (Tr. 430-31). In addition, she had problems using her hands and fingers because of pain, numbness, and tingling. (Tr. 431). After using her hands for fifteen to twenty minutes, her hands go numb, tingle, and hurt. (Tr. 431-432). She used heating pads, ointments, and pain medications, but her medication made her drowsy. (Tr. 433). Morgan testified that some days she did not get dressed because she was too depressed. (Tr. 433-34).

Morgan's husband, David Morgan, testified that his wife would be in bed when he left for work in the morning and she would be in a recliner or on the couch, using a heating pad and watching television, when he comes home. He testified that his wife used to be outgoing, worked out, and did the yard work and grocery shopping with him, but now she stayed groggy and sleepy. (Tr. 435). He had observed that she dropped things and had difficulty picking up items. (Tr. 436).

The vocational expert witness identified Morgan's past work as an office clerk as light exertion and semiskilled. (Tr. 439). Based upon a hypothetical question that assumed a functional ability to perform light work with limited interaction with the public, the vocational expert indicated that Morgan's past work could be performed under those circumstances (Tr. 439). Upon questioning by Morgan's counsel, the vocational expert testified that an individual with difficulty using her hands on a constant or frequent basis could not perform the job because it required frequent use of the hands and arms for reaching, handling, and fingering. (Tr. 441).

3.    Administrative Decision

The ALJ found that Morgan had not engaged in substantial gainful activity since her alleged onset date and had degenerative disc disease and depression, which were severe impairments, but did not meet or equal in severity the requirements of any impairment listed in Appendix 1 of the disability regulations. (Tr. 17). He further found that Morgan had moderate limitations in her activities of daily living and social functioning, but seldom experienced deficiencies in concentration, persistence and pace, and had no episodes of deterioration or decompensation in a work or work-like setting. (Tr. 17). The ALJ found that Morgan had the residual functional capacity to lift and carry ten pounds frequently and twenty pounds occasionally, stand/walk six hours in an eight-hour work day, and sit six hours in an eight-hour work day. He further found that she would be restricted to limited interaction with the public. (Tr. 18). Based upon this functional capacity assessment, the ALJ found that Morgan could perform her past relevant work as an office clerk, and accordingly, he concluded that she was not disabled. (Tr. 19-20).

D    DISCUSSION

1.    Step Three Assessment for Listed Impairments

Morgan asserts that the ALJ did not adequately evaluate whether her impairments meet or medically equal one of the impairments listed in the appendix to the disability regulations. The ALJ found that Morgan did not satisfy the disability requirements at Step Three of the sequential evaluation process, but Morgan contends that the ALJ did not sufficiently articulate the reasons that her condition did not meet or equal Listing 1.04 and render her presumptively disabled based on

medical factors alone.  Listing 1.04 addresses musculoskeletal impairment of the spine:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, app. 1, § 1.04.

Fifth Circuit jurisprudence reflects a reluctance to impose "formalistic rules" on the contents of an administrative decision.  *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir.1994)(declining to require that ALJ specifically articulate evidence supporting a credibility finding and discuss the evidence that was rejected).  However, the Fifth Circuit has recently clarified that the ALJ is required to discuss the evidence offered and state the reasons for an adverse determination at Step Three. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).  Summarily concluding that a claimant fails to meet or equal the criteria of an unspecified listing is insufficient because it does not permit meaningful judicial review.  *Id.*

The ALJ's decision includes an affirmation that he considered the listed impairments for mental impairments and musculoskeletal disorders.  In addressing the requirements of a listing-level mental disorder, the ALJ found that Morgan's mild to moderate degree of functional loss did not meet the criteria.  (Tr. 17).  In considering Morgan's physical impairments, the ALJ did not identify Listing 1.04 by number, but explained that there was "no evidence the claimant has experienced the

degree of functional limitation and neurological involvement contemplated in the Listings criteria for a musculoskeletal impairment." (Tr. 17-18). He also cited to the medical reports supporting his assessment. (Tr. 18). The ALJ did not summarily conclude that Morgan had no listing-level impairment and his written decision is adequate to permit meaningful judicial review, which distinguishes this case from the concerns that the Fifth Circuit expressed in *Audler*. *See Audler*, 501 F.3d at 448 (finding error when ALJ did not offer any reason for adverse determination at Step Three). *See generally Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990) (noting that impairment manifesting only some of the criteria, no matter how severely, does not qualify); 20 C.F.R. § 404.1525(d) (noting that impairment must satisfy all criteria in a listing).

Even if the ALJ's explanation were insufficient, remand would be necessary only if substantial rights have been affected. *Id.*; *Mays v. Bowen*, 837 F.2d 1362, 1364 (1988). The ALJ's failure to set out a basis for his decision at Step Three affects substantial rights when the claimant appears to have met his burden to demonstrate that he meets or equals a listing. *See Audler*, 501 F.3d at 449. Although Morgan asserts that Listing 1.04 is applicable, she has not contradicted the ALJ's explanation that she lacks the nerve root involvement and functional limitation contemplated by Listing 1.04A. The ALJ sufficiently identified the rationale underlying his adverse finding at Step Three, and Morgan has not demonstrated that she suffered substantial prejudice as a result of any alleged deficiencies in the ALJ's discussion.

    2.     Residual Functional Capacity Assessment

Morgan asserts that the Commissioner's decision is not supported by substantial evidence

because the residual functional capacity (RFC) assessment is deficient. The ALJ found that Morgan is capable of performing light work with limited public interaction; however, Morgan argues that the ALJ failed to consider additional and significant limitations in her work-related abilities.

RFC is what an individual can still do despite her limitations. SOCIAL SECURITY RULING 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.*; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). RFC is not the least an individual can do, but the most. SOCIAL SECURITY RULING 96-8p. The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered. *Id.* The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. SOCIAL SECURITY RULING 86-8.

Morgan notes that diagnostic tests confirm a partial rotator cuff tear of her right shoulder, with shoulder impingement and bursitis, and the state agency physicians found Morgan was limited bilaterally in overhead reaching. Morgan also refers to reports documenting cervical radiculopathy with weakness of her dominant right upper extremity, diminished reflexes, and reduced sensation, and restricted motion in her neck and lumbar spine. Box also prepared a functional capacity assessment in 2003 in which he opined that Morgan could not perform fine work with her hands or high speed assembly and was further restricted from working in cold environments, damp or wet

areas or being exposed to heights. (Tr. 210). Morgan contends that the ALJ failed to consider or accommodate any of the foregoing limitations.

The ALJ's decision reflects that he recognized and compensated for Morgan's degenerative disc disease in the RFC assessment by limiting her to light work. Moreover, the vocational information provided in the Selected Characteristics of Occupations (SCO) published by the Department of Labor indicates that an office or clerical job does not require working in cold, damp environments, near moving machinery, or at heights. SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES Part A, § 07.07.03 at 348 (1993)(identifying environmental requirements for general clerical work). But more troubling is the ALJ's omission of any mention of Morgan's allegations of a reaching limitation given evidence that she had a partial rotator cuff tear, previous and current complaints of problems working with her hands and arms, and the state agency medical consultants' determination that Morgan should avoid work requiring overhead reaching. Without any insight into the ALJ's reasons for excluding any reaching or handling limitations, the court must find the omission prejudicial because the vocational evidence indicates that frequent reaching, handling, and fingering is required to perform the duties of office clerk. (Tr. 441). Remand is necessary to provide the Commissioner with an opportunity to discuss and quantify the restrictions, if any, that Morgan may have in her ability to use her arms and hands in the performance of work-related duties.

Morgan also complains of the ALJ's failure to comply with the Commissioner's rulings on the role of obesity in a disability determination. The Social Security rulings recognize that obesity,

although not a listed impairment, can reduce an individual's occupational base for work activity in combination with other ailments. See SOCIAL SECURITY RULING 02-1p; SOCIAL SECURITY RULING 96-8p. A claimant's obesity must be considered at all steps of the sequential evaluation process. SECURITY RULING 02-1p.

Morgan was identified as moderately obese, but the ALJ did not mention Morgan's weight or evaluate the impact of obesity upon her ability to perform work-related functions. Nonetheless, she has identified no additional limitations imposed by her obesity, and counsel, when given the opportunity, did not question the vocational expert about any functional restrictions allegedly caused by her obesity. The ALJ assessed a RFC for a limited range of light work, and there is no indication that Morgan's weight further restricted her RFC or rendered her disabled when considered in combination with her other impairments.

Morgan complains that the ALJ gave inadequate attention to her mental impairments and the opinions of the state agency medical consultants. Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence (from non-examining sources) at both the administrative hearing and Appeals Council levels of administrative review. 20 C.F.R. §404.1527(f); SOCIAL SECURITY RULING 96-6p. The ALJ and the Appeals Council are not bound by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions. SOCIAL SECURITY RULING 96-6p.

Contrary to Morgan's argument, the ALJ did not ignore the findings of the state agency

physicians, but instead noted that his determination was generally consistent with the opinions offered by the state agency physicians. (Tr. 19). The ALJ's opinion is compatible with the primary findings and opinions of the state agency physicians, who found Morgan capable of a modified range light work activity; however, the ALJ did overlook the state agency physicians' determination that Morgan has some limitation in the use of her upper extremities for overhead reaching, which for the reasons outlined above necessitates a remand so that the ALJ may comply with the regulations and rulings.

Morgan further argues that the ALJ's opinion was inconsistent with the state agency assessment because the ALJ found she has depression, while the state agency medical consultants concluded that Morgan had both depression and an anxiety-related disorder. Morgan asserts that the state agency assessment is consistent with the report from consultative examiner Patel, who examined her and diagnosed a post traumatic stress disorder; however, the ALJ found that Patel's objective findings and Morgan's limited pursuit of mental health treatment reflected that Morgan's condition had remained relatively stable and he rejected Patel's GAF assessment that suggested more significant functional impairment. (Tr. 19). Moreover, the state agency medical consultants did not find Morgan was disabled, but instead opined that she could follow detailed instructions, attend and concentrate on tasks for extended periods, accept instruction, and adapt to change in the work setting.

The ALJ's failure to address Morgan's ability to use her upper extremities warrants remand so that the Commissioner can develop and address this issue. In all other respects, substantial evidence supports the ALJ's assessment of Morgan's residual functional capacity and the assessment

has not been shown to be a product of legal error.

3.    Vocational Expert Testimony

Morgan asserts that the ALJ did not obtain sufficient or credible vocational evidence to support his decision. More specifically, she contends that the ALJ did not present an accurate hypothetical question to the vocational expert that reflects all of her limitations, and accordingly, the vocational expert's testimony cannot serve as substantial evidence to support the ALJ's decision.

The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's residual functional capacity assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A claimant's failure to point out problems in a defective hypothetical does not salvage that hypothetical as a proper basis for a disability determination. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

For the most part, Morgan's argument is a restatement of her position that the ALJ ignored reports from the state agency physicians and erred in his assessment of her RFC, and being repetitive, these issues need not be addressed again. Because the case requires remand so that the Commissioner can expressly address the limitations, if any, in Morgan's ability to use her upper extremities, the Commissioner may deem it advisable on remand to secure additional vocational expert testimony or assistance in evaluating Morgan's disability.

Nonetheless, Morgan has raised an additional issue that deserves review: She challenges whether her mental impairment would permit her to perform the level of reasoning required for an

office clerk. According to the Dictionary of Occupational Titles, the job of general office clerk has a reasoning level of 3. DICTIONARY OF OCCUPATIONAL TITLES § 209.562-010 (rev. 4th ed. 1991). "Level 3" reasoning skills require commonsense understanding to carry out instructions furnished in a written, oral, or diagrammatic form and deal with problems involving several concrete variable in or from standardized situations. *See* DICTIONARY OF OCCUPATIONAL TITLES app. C (rev. 4th ed. 1991)(Scale of General Education Development). "Level 2" reasoning skills require the employee to apply commonsense understanding to execute detailed but uninvolved instructions and deal with problems involving a few concrete variables in or from standardized situations. *See id.*. "Level 1" reasoning skills require the application of commonsense understanding to carry out simple one- or two-step instructions and dealing with standardized situation with occasional or no variable in situations encountered on the job. *See id.*

The ALJ found that Morgan seldom experiences deficiencies in concentration, persistence and pace. (Tr. 17). The state agency reviewing physician found that Morgan is moderately limited in this category, but also opined that Morgan was able to understand, remember, and carry-out detailed but not complex instructions. (Tr. 236). Morgan argues that the ALJ should have explained why he disagreed with the state agency physicians and found her capable of performing complex reasoning requirements of her past relevant work. But Morgan's argument is based on her unsupported proposition that "Level 3" reasoning skills, which are founded on commonsense understanding, are by definition complex and exceed her capacity for detailed work. Morgan's reliance on Mickel's assessment of various deficiencies in her work-related learning abilities to

bolster her argument is no more persuasive because Mickel found that Morgan could return to her past relevant work with minimal adjustment.

Morgan also complains that the ALJ failed to question the vocational expert about conflicts between her testimony and the <u>Dictionary of Occupational Titles</u>. Social Security Ruling 00-4p imposes an affirmative duty on the adjudicator to inquire into possible conflicts between vocational expert evidence and the DOT. *See generally* SOCIAL SECURITY RULING 00-4p. Morgan, however, does not identify any inconsistencies between the vocational expert's testimony and the DOT description for the same job, nor has she otherwise demonstrated that she would have benefitted had the ALJ expressly asked the vocational expert about any conflict between her testimony and published vocational sources. On remand, the Commissioner may obtain additional assistance from a vocational expert or other vocational resource with respect to Morgan's ability to use her upper extremities, or any other issues as the Commissioner deems appropriate, but Morgan has otherwise failed to demonstrate that the vocational expert provided deficient testimony.

4.     Credibility Assessment

Morgan complains that the ALJ did not assess her credibility in accordance with the Commissioner's regulations and rulings. In evaluating a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); SOCIAL SECURITY RULING 96-7p. Once the impairment is found, the ALJ evaluates the intensity, persistence and limiting effects of the symptoms on the claimant's ability to do basic work activities. 20 C.F.R.

§§ 404.1529, 416.929. A claimant's testimony must be consistent with the objective medical evidence and other available evidence. *Id.*; 20 C.F.R. § 416.929. Factors to consider include (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) the medication used to alleviate the pain; (5) other treatment measures; and (6) other relevant factors. 20 C.F.R. § 404.1529(c). An ALJ's unfavorable credibility evaluation will not be upheld on judicial review where the uncontroverted medical evidence shows a basis for the claimant's complaints unless the ALJ weighs the objective medical evidence and articulates reasons for discrediting the claimant's subjective complaints. *Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir.1994); *Abshire v. Bowen,* 848 F.2d 638, 642 (5th Cir. 1988). The ALJ is not required to give precedence to subjective evidence over objective medical evidence. *Hollis,* 837 F.2d at 1385.

Morgan testified that she has very limited daily activities, takes medication which produces drowsiness, lies down during the day, and uses a heating pad and ointment to relieve her symptoms. Her husband's testimony was consistent with her report. Morgan complains that the ALJ failed to explain why he found her subjective complaints were not credible.[8] The ALJ found that Morgan's

---

[8] Morgan contends that the ALJ did not discuss the supporting testimony that her husband provided. The Fifth Circuit has declined to prescribe any rigid or set formula for the ALJ to follow when articulating the reasons underlying his decision on disability. *See Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir. 1994). Although it might be preferable for the ALJ to specify the weight assigned to other lay testimony, the ALJ's decision reflects that he was aware of and considered Morgan's very limited daily activities, but found the medical record did not substantiate the degree of pain and functional limitation alleged. (Tr. 18). *See* SOCIAL SECURITY RULING 96-7p (addressing the evaluation of a claimant's credibility). *See also* 20 C.F.R. § 404.1513(d) (listing other sources that may be considered in assessing claimant's impairments). The ALJ is not required to mention each and every piece of evidence so long as he has developed the record fully and fairly and has sufficiently articulated the basis for his decision. *See Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir. 1996); *Miller v. Shalala,* 8 F.3d 611, 613 (8th Cir. 1993).

impairments could reasonably be expected to produce the symptoms alleged, but that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. (Tr. 19). The ALJ reviewed Morgan's treatment history and affirmed that he had considered Morgan's complaints in accordance with the relevant regulations and rulings, (Tr. 18), and given her every benefit of the doubt regarding her functional limitations. (Tr. 19). The ALJ's determination comports with the Commissioner's regulations and rulings and adequately addresses the credibility of the testimony given. Morgan has not shown that the ALJ's credibility assessment is not entitled to deference.

## RECOMMENDATION

It is recommended that the decision of the Commissioner be reversed and remanded for further proceedings consistent with these proposed findings of fact and conclusions of law.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until June 24, 2008. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings,

conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until June 24, 2008, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED JUNE 2, 2008.

CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE